UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JUDITH COX and CHARLES COX individually and as Personal Representatives of the Estates of C.J.P. and B.T.P., <br><br>      Plaintiffs, <br><br>    v. <br><br> STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, FOREST JACOBSON, ROCKY STEPHENSON, JANE WILSON, and BILLIE REED-LYYSKI, <br><br>      Defendants. | NO. 14-05923RBL <br><br> **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT TO STRIKE DEFENDANTS' AFFIRMATIVE DEFENSES NOS. 1, 2, 3, 4, 10, 11 & 12.** <br><br> **NOTED FOR CONSIDERATION:** <br><br> **JULY 31, 2015** |

Joshua Powell brutally murdered C.J.P. and B.T.P. while the boys were under the care, custody and control of DSHS and during a DSHS supervised visit. Defendants had ample reason and a duty to protect the boys, but did not. Defendants knew Powell was the lead suspect in the disappearance of the boys' mother and were warned he was a risk to the boys, yet ignored that information and set in motion a series of events that gave Josh Powell the means and opportunity to

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - 1
{00146778;1}

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

take the lives of these innocent children.  The Child Protective Services (CPS) investigator assigned to the case, Rocky Stephenson, and his supervisor were warned by law enforcement that Powell was a strong candidate to harm the boys, but did next to nothing, failing to investigate or conduct interviews vital to an understanding of Josh Powell and his history of domestic violence.  DSHS social worker Forest Jacobson ignored her obligation to inform the court of Powell's repeated violations of court orders and moved Powell's supervised visitations with the boys to his residence without informing the court and without performing any type of safety assessment.  She also expanded visitation against the recommendations of the boys' counselor.  Plaintiffs' expert, Dr. Anne Ganley, describes Jacobson's actions as follows:

> In fact, a review of the Powell file shows that Josh Powell repeatedly violated the terms of supervised visits without ever being held accountable for doing so.  Instead of holding Josh accountable, social workers consistently accommodated his controlling requests and continued to expand visitation to less restrictive and less safe locations.

*Declaration of Evan Bariault* ("*Bariault Decl.*"), Ex. 57, ¶ 22.  Through intentional behavior and in violation of their duties the defendants created an environment that fueled conflict, empowered Powell and provided him the means to brutally murder C.J.P. and B.T.P.

The facts establish that many of the defendants' affirmative defenses stated in defendants' answer (*Dkt*. 15) fail as a matter of law and should be stricken.

## I.     RELIEF REQUESTED

The Court should strike defendants' affirmative defenses nos. 1, 2, 3, 4, 10, 11 and 12.

## II.     STATEMENT OF FACTS

On December 6, 2009, Susan Powell went missing from her home in West Valley City, Utah.  Her husband, Joshua Powell ("Powell"), was suspected of murdering her.  Very shortly after Susan

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

disappeared, Powell, along with his two young sons, C.J.P. and B.T.P., moved to Washington to live with his father, Steven Powell.

Defendants first became familiar with the Powell children in March 2010. Between March 2010 and September 2011 DSHS received four separate intakes surrounding the children. *Bariault Decl.*, Ex. 1. One intake involved a child care provider who informed DSHS C.J.P. made statements about how to kill and dispose of a bear so no one would know where you buried the bear. *Id.* (PLA 000020). The provider was concerned the statements could have been a reference to how Susan Powell may have been killed and buried. Another involved a school counselor concerned about C.J.P. telling another classmate he was going to kill him because he was Mormon, that he hates Jews and his mother only lives a mile away but cannot see her because her parents (Charles and Judith Cox) are Mormon and abuse her. *Id.* (PLA 000030). Despite the multiple intakes, CPS never opened any investigations.

On June 28, 2011, Detective Ellis Maxwell of the West Valley City Police Department (WVCPD), the lead detective in Susan Powell's disappearance, came to Washington to discuss the safety of C.J.P. and B.T.P. *Bariault Decl.*, Ex. 2. Maxwell met with Julie Slaughter and specifically requested DSHS do a home visit to check on the kids and conduct a risk assessment. DSHS inexplicably refused the request. *Id.*

DSHS did not open a case until September 22, 2011, when it learned Pierce County Sheriff's were planning to arrest Josh Powell's father, Steven Powell. *Bariault Dec.*, Ex. 3 (PLA000035). In its own internal documents, DSHS described the case as follows: "This is a high profile case that has garnered the attention of the national media…Josh Powell is a suspect in the murder of his wife." *Id.*, Ex. 4 (p. 3 of 4).

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

On September 22, 2011, defendant Rocky Stephenson, a DSHS CPS investigator, drove with Pierce County detectives to take C.J.P. and B.T.P. into custody. *Bariault Decl.*, Ex. 5; Ex. 6 (19:12-18). He was assigned to the case by his supervisor, defendant Billie Reed-Lyyski. On or before that date defendants knew the following:

- Charlie and Braden were in the home with their father Josh, grandfather Steven, aunt Alina and uncle John;
- Law enforcement had located sophisticated child pornography on some of the 15 computers it had seized from the Powell home in August 2011;
- Pornography was lying out in Steven's bedroom;
- John had a hangman's noose and a gallows in his room, along with a picture of a woman with a sword in her vagina coming out of her stomach;
- John was known to run around the house nude and in a diaper;
- Powell was a suspect in the child pornography investigation; and
- Powell was the primary person of interest in the disappearance of the boys' mother.

*Id.*, Ex. 3 (PLA 000035); Ex. 6 (19:21-20:2).

On September 26, 2011, defendant Stephenson and defendant Reed-Lyyski, along with two Pierce County Sheriff's Detectives, supervised a visit between Josh Powell and his children at a DSHS office visitation room. *Bariault Decl.*, Ex. 7 (Cox 01010059-60). Several concerns arose from the supervised visit. B.T.P. expressed that he did not want to see his father. *Id.* Josh Powell inappropriately ranted about his views of Mormons (the Coxes' faith), and about people wanting to take the boys away from him; he had to be "redirected" at times throughout the visit. *Id.* After the visit Powell asserted that his wife's parents were trying to destroy his family, that he opposed placing the boys with them, and that they held him responsible for the disappearance of their daughter. *Id.* (Cox 01010061). Based on their observation of that initial visit, defendants already had concerns about Josh Powell's abnormal controlling behavior towards the boys. *Id.*, Ex. 8 (62:9-22). The Pierce County detectives also had serious concerns surrounding Josh Powell and expressed their

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

concern to DSHS that Josh Powell was a lethal risk to his children. *Id.*, Ex. 9, ¶¶ 18-19; 10, ¶¶ 18-19.

On September 27, 2011, DSHS filed a dependency petition because Josh Powell could not be ruled out as a suspect in possession of child pornography. *Bariault Decl.*, Ex. 6 (21:3-7); 12 (49:17-50:11). DSHS had also been informed Josh Powell was close to being arrested in his wife's disappearance; the agency believed that Powell was responsible for her disappearance. *Id.,* Ex. 11 (14:7-16:21); 16 (27:16-29:3). Defendant Forest Jacobson was the assigned social worker and drafted the dependency petition. *Id.*, Ex. 16 (23:1-3).

Defendant Jacobson also drafted a "Visiting Plan" for C.J.P. and B.T.P. The plan required Powell's visitation with the boys take place at a Division of Child and Family Services (DCFS) office "or other pre-approved dcfs location" and that the time for visits was not negotiable. *Bariault Decl.*, Ex. 13 (PLA 000280). The plan made no provision to move the visitations to Powell's residence or a non-DCFS location, *Id.*; indeed, DSHS policy requires that supervised visitation take place at a DSHS site or "[o]ther site as pre-approved by social worker that ensures safety of child." *Id.*, Ex. 15 (p. 13 – Attachment A); *see also* Ex. 14 (Cox 01130443) (Visitation must occur "[i]n a setting that assures the safety of the child(ren)). DSHS policy also required a safety plan to address unexpected circumstances. *Id.*, Ex. 15 (p. 12).

A contested shelter care hearing was held on September 28, 2011. Defendants Jacobson and Stephenson were present as the DSHS attorney informed the court that it believed Josh Powell caused his wife's disappearance; effectively recognizing Josh Powell murdered a member of his family, the most extreme form of domestic violence. *Bariault Decl.*, Ex. 16 (27:16-22; 29:19-30:1). The court's order placed the boys in foster care with the Coxes. *Id.*, Ex. 17 (PLA 000085). The order also placed significant restrictions on Josh Powell's access to his children, limiting contact to visits

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

supervised by a DSHS-approved provider every Sunday for three hours. *Id*. Powell was ordered not to discuss the dependency case or other pending litigation with the children or make disparaging or derogatory comments about the Coxes. *Id*. The court made it clear it was concerned about "the effect of the family conflict on the children" and DSHS indicated it understood the concern. *Id*., Ex. 16 (46:17-24; 56:3-13; 64:22-65:7). The order also provided the assigned social worker, defendant Jacobson, discretion to expand visitation. *Id*., Ex. 17 (PLA 000086). Powell was also ordered to undergo a psychological and parenting evaluation. *Id*.

Approximately one month later on October 26, 2011, the court issued an "Order of Dependency as to Josh Powell" that placed the children "in the custody, control and care of DSHS." *Bariault Decl*., Ex. 18 (PLA 000094). The order continued the three hour weekly visitations with supervision by "a provider approved by the department social worker and GAL" and again prohibited "discussion with the children of the pending dependency case or other litigation" as well as derogatory comments about the Coxes. *Id*. (PLA 000098). The October 2011 Order also mandated that defendant Jacobson, "immediately notify the court if…compliance is not satisfactory." *Id*. (PLA000099).

1. **The defendants disregarded serious safety concerns and failed to investigate obvious domestic violence issues.**

Defendants believed that Josh Powell caused his wife's disappearance and potentially her death, "probably the very worst type of abuse that you could perpetrate on children." *Bariault Decl*., Ex. 16 (28:4-11). Contrary to DSHS policy, however, not one defendant assessed or planned for the risk of domestic violence during parent-child visitations during the boys' dependency. DSHS policies required screening for domestic violence ("DV") risks at each stage of a child dependency case

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

regardless of the reason for intervention. *Id.,* Ex. 57, ¶ 10, Ex. C. If a potential for DV is identified, DSHS must conduct a specialized assessment of risks. *Id.,* ¶ 11. This includes gathering detailed information about the DV perpetrator's patterns of abusive tactics and how they affect the child, and doing a "lethality assessment": "The service plan should focus on mitigating the danger posed by a DV perpetrator by increasing a perpetrator's accountability and reducing his/her ability to use abusive and controlling tactics with the child, care givers, and the department workers." *Id.,* ¶ 13. In all cases policy required that decisions and plans concerning access to a child be based on that DV specialized assessment, in addition to the traditional safety assessment conducted by DSHS. *Id.,* ¶ 11. DSHS should have re-assessed lethality throughout the case and taken appropriate action when needed. *Id.,* ¶ 15.

The DSHS guide notes that a social worker should guard against being manipulated by DV perpetrators who frequently portray themselves as victims. *Id.,* ¶15. Perpetrators commonly use child visitation to continue their abusive control, employing a variety of tactics such as insisting on certain limitations or conditions – i.e., certain food, clothing, or activities – and by failing to finish visits in a timely manner. *Id.,* ¶ 16. The guide provides that visitation needs to be carefully structured for the child's safety, and clear consequences must be administered when a parent fails to comply with conditions or court orders. *Id.*

The guide also provides that a social worker should consider potential DV when deciding who supervises the visits as well as the location and frequency of the visits. *Id.,* ¶ 17. A visit supervisor must understand the dynamics of DV (particularly coercive controlling tactics), know when and how to intervene with the parent's abusive and controlling conduct, and understand that he or she is empowered to terminate the session whenever necessary for the safety and well-being of the child. *Id.*

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

Defendants never assessed this case for domestic violence, at any stage.

### a. Powell's sister warned defendant Stephenson of a lethal threat.

Early in the dependency, Stephenson interviewed Jennifer Graves, one of Josh Powell's sisters. *Bariault Decl.*, Ex. 19. Graves informed Stephenson that she would be concerned about the health and safety of the children in Powell's care. *Id.* She warned that Powell had mental health issues, obsessive compulsive tendencies, inability to hold down a job and had neglected the children. *Id.* She informed Stephenson that Powell was controlling and treated Susan Powell and his children like possessions. *Id.*, Ex. 20, ¶ 6. She relayed to Stephenson numerous facts surrounding Susan's disappearance – she warned that anyone capable of hurting, abusing or killing their spouse was certainly capable of doing the same to his kids. *Id.*, ¶ 9.

### b. Defendants heard safety concerns from the community, police, the boys' grandfather, their therapist and within DSHS.

On October 17, 2011, defendant Jacobson received an email from Nancy LeMay, whom had observed Powell in the community. *Bariault Decl.*, Ex. 21. Ms. LeMay wrote, "On more than one occasion I witnessed Josh taking one or both of the boys by the wrists and dragging them...He actually had them pulled up so far that their feet barely touched the floor." *Id.*

That same day, DSHS completed a "Structured Decision Making Risk Assessment." Under "Caregiver characteristics" it was noted that Powell was involved in harmful relationships. *Bariault Decl.*, Ex. 22 (PLA 000555). The overall assessment resulted in a low score, but it was overridden and elevated to a final risk level of "Moderately High" because of "incredible" collateral information that indicated a "higher risk." *Id.* (PLA 000557). Stephenson even applied for Crime Victims Compensation based on the boys being the children of a murder victim. *Id.*, Ex. 23. Still, defendants

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

conducted no DV assessment.

On November 12, 2011, Defendant Jacobson received a call from Pierce County Detective Sanders that approximately 400 images of child porn were found on Josh Powell's computer. *Bariault Decl.*, Ex. 60. On November 15, 2011, Detective Maxwell notified Stephenson that WVCPD had found computer-generated incestuous child pornography on Powell's computers. *Id.,* Ex. 24 (Cox 01010255).

On December 9, 2011, Lori Narigi, the boys' counselor, reported to defendant Jacobson that Powell had behaved erratically and abusively at a counseling session with the boys. *Bariault Dec.*, Ex. 25. He ranted in front of the boys about the Cox family, the media, and the litigation. *Id.* According to the case note, "When the boys joined the session, Josh informed the boys that the Mormon police had made up bad information about their grandpa [Steven Powell] and put him in jail and that they were trying to do the same thing to him." *Id.* Ms. Narigi was unable to redirect Powell to other topics. *Id.* She expressed concerns regarding any increased visitation that was not supervised by a DSHS representative. *Id.* In a December 9, 2011 email to defendant Jacobson, guardian *ad litem* Julio Serrano wrote that he too had observed Powell "ranting" about the Coxes. *Id.*, Ex. 26. Even defendant Reed-Lyyski testified that DSHS was concerned that Powell was "very controlling" of the boys during the supervised visitations. *Id.*, Ex. 8 (62:9-13).

Family Preservation Services staff said that C.J.P. had been programmed to hate and was brainwashed. *Id.*, Ex. 27. C.J.P. made statements that he was not supposed to discuss his mother, and that Mormons are fake and evil. *Id.*

On multiple occasions, Charles Cox informed DSHS about inappropriate behavior and statements made by the boys. *Bariault Decl.*, Ex. 28, ¶7. For example, the boys wanted to sleep naked and told the

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

grandparents that they slept naked with Powell. *Id.* The boys were also "violent" when they first began staying with the Coxes and used language that was inappropriate. *Id.* The Coxes continually shared these comments with DSHS. *Id.* Cox testified:

> I constantly felt as though Forest and DSHS were more concerned about making Josh happy and focusing on his concerns than worrying about the children and their well-being. Josh constantly tried to dictate how Judy and I took care of the boys. This was evident because Forest would often come to us with various requests from Josh about the boys and our management of their care. I found this to be inappropriate as I felt like Forest was advocating for Josh's interests….Josh sought to control everything and it seemed to work in his interactions with DSHS.

*Id.*, ¶10.

## 2. Defendants, primarily Jacobson, ignored court orders and set an alternative path that jeopardized the boys' safety and well-being.

Powell's visits with his children during the dependency initially took place at the office of the Foster Care Resources Network (FCRN), the DSHS contractor selected to supervise the visits. *Bariault Decl.*, Ex. 29. FCRN is a secure facility with an advanced alarm system in case of emergency. *Id.*, Ex. 30 (26:12-27:16). Elizabeth Griffin-Hall of FCRN was selected as the visitation supervisor. Griffin-Hall had experience supervising visits at secure facilities, but had never conducted a supervised visit at a parent's home. *Id.* (29:13-19). Defendants did nothing to train Griffin-Hall on supervision or prepare her for the nuances of this particular case. Defendants apparently provide no training for visitation supervisors, even those who have never supervised before. *Id.*, Ex. 31 (44:5-25; Ex. 58 (50:15-19). Defendant Jacobson preliminarily informed Griffin-Hall that there was potential that Powell may try and flee with the children; she said she did not want to alarm Griffin-Hall but wanted her to be prepared for the "just in case" possibilities. *Id.*, Ex. 29; Ex. 31 (45:13-46:6). Jacobson informed Griffin-Hall that Powell was to keep "his discussions free

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

of any details around the dependency, custody action by grandparents, the investigation around the mother's disappearance, and the investigation around the grandfather's arrest/child porn[.]" *Id.* Jacobson described an example of talking about the dependency as follows: "You'll be home by Christmas. CPS is keeping you from me." *Id.,* Ex. 31 (47:17-21). Aside from telling Griffin-Hall to call 911 in case of emergency, Jacobson did not propose any other safety measures despite supervision being assigned at the highest level. *Id.* (46:14-17).

Prior to the first visit, Griffin-Hall spent an hour on the phone with Powell explaining that he was not to discuss the dependency, make promises to the kids or talk badly about the Coxes – exactly what was outlined in the shelter care hearing and dependency orders. *Id.,* Ex. 32 (Cox 01011181). Despite those instructions, on the first supervised visit with the boys, Powell discussed the dependency and told the boys he was trying to bring them home as soon as possible. *Id.* (Cox 01011182). On each of the following three visits Powell violated the court order restricting the nature of discussions. *Id.,* Ex. 33 (JSR 916; JSR 921; JSR 924; JSR 927). Jacobson and Griffin-Hall were present during one of the visits and the Visit Report Form does not describe any intervention by either or consequences for Powell's behavior. *Id.* (JSR 924-25). On October 30, 2011, just days after the dependency order was entered, Powell again brought up his new home, telling the boys that the social worker would let them see it soon. *Id.* (JSR 927). "He was very excited and told the boys all about his house," again showing them photos of it. *Id.* All of this information was presented to and reviewed by defendant Jacobson. *Id.,* Ex. 31(48:8-49:3; 52:5-9; 83:4-9).

Griffin-Hall reported to DSHS that during a supervised visit on November 27, 2011, Powell became agitated and red-faced when one of the boys said that his "mommy's body" was found in the desert. *Bariault Decl.*, Ex. 34 (Cox 01011490). Josh grilled the boys about who had told them that.

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

1    *Id.*

2        Contrary to the court's order, Jacobson never informed the court of Powell's repeated

3    violations.  On October 24, 2011 and January 5, 2012 Jacobson filed Individual Service and Safety

4    Plans (ISSP). *Id.*, Ex. 35.  The ISSPs "provide to the Court all of the information about the case

5    status." *Id.*, Ex. 31 (84:3-7).  Jacobson's ISSPs merely informed the court that "Mr. Powell has

6    attended all scheduled visitation[.]" *Id.*, Ex. 35 (PLA 000395; 411).  Although Jacobson was aware

7    of the violations, acknowledged Powell's acts as violations and detrimental to his children's

8    emotional well-being, and informed FCRN and Griffin-Hall that Powell was not to commit such

9    violations, she did not alert the court to these violations.  *Id*, Ex. 30 (73:2-20); Ex. 31 (87:21-88:1;

10   90:20-23; 91:5-15; 119:5-23); Ex. 36 (Cox 01010160-62; 01010215; 01010315; 01010359-60;

11   01010366; 01010386).  At her deposition she testified she did not feel she needed to inform the court

12   that Powell was discussing the dependency, even though her failure to act was in complete disregard

13   of the court's orders. *Id.*, Ex. 31 (87:14-20).

14      **3.  Defendants accommodate Powell, move visits to his residence.**

15       Starting November 6, 2011, defendant Jacobson, with approval from Jane Wilson, her

16   supervisor, moved supervised visitations from the FCRN office to Powell's new home, primarily

17   because he had persuaded the boys to be excited about it – something Jacobson acknowledged

18   violated the court's orders.  *Bariault Decl.*, Ex. 37; Ex. 31 (91:5-15).  Jacobson testified that

19   visitation was moved to Powell's home because Powell's "notoriety" disturbed other families. *Id.*,

20   Ex. 31 (88:25-89:9); Ex. 38, ¶ 8. However, Griffin-Hall testified that Powell's visits never

21   interrupted any other families. *Id.*, Ex. 30 (94:6-10).  Any disruption was the result of Powell's own

22   behavior and failure to follow the visit guidelines, often going over his time limit because of

23   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
     JUDGMENT - 12
24   {00146778;1}

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

"extravagant activities and meals," behaviors outlined in the "Social Workers Practice Guide to Domestic Violence" – to which all defendants failed to adhere. *Id.*, Ex. 38, ¶ 8; Ex. 57 – Ex. C. Jacobson also testified that Josh Powell had no "mental health condition that would indicate moving visits to Mr. Powell's home would be an issue on any level." *Id.*, Ex. 38, ¶ 8. While Jacobsen testified Powell's court-ordered psychological evaluation had been completed prior to moving the visit location, however, the visitation was actually moved more than a month *before* its completion. *Id.*, Ex. 38, ¶ 8; Ex. 39 (p.1 – Date of Evaluation: 12.09.11). Jacobson knew absolutely nothing about Powell's mental health before moving the visitations. In addition, Jacobson claims she saw the home and did not observe any safety issues, but admits there was no assessment other than a cursory walkthrough. *Id.*, Ex. 31 (102:12-104:21). Jacobson did not verify whether the home had smoke detectors, whether Powell had any weapons in the home, or whether there were proper exits in the case of an emergency. *Id.* In fact, when asked the simple question of whether she would be concerned about a visit location not having smoke detectors, she provided this shocking response: "Well, as ironic as it sounds, only if there's a fire." *Id.*, (108:19-22). Jacobson testified she did not assess even the possibility of an emergency despite her warning Griffin-Hall to be aware of such risk prior to the first visit at a secure DCFS location. *Id.* (108:23-109:7). Moreover, the move was contrary to the "Visiting Plan" Jacobson drafted on September 27, 2011 and the "Updated Visiting Plan" she drafted on December 29, 2011; both stated visits would only occur at "dcfs office or other PRE approved dcfs location." *Id.*, Ex. 13. Powell's residence was not a "dcfs location."

Despite DSHS policy requiring a visitation site that "ensures safety," Jacobson gave no consideration to the location and remoteness of Powell's home or his ability to control the environment. *Id.*, Ex. 14. Griffin-Hall reported that the house "was difficult to find" within a "maze

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

of streets, courts, avenues and circles." *Id.*, Ex. 37. Indeed, Jacobson and Dr. Manley both got lost trying to find the house. *Id.*, Ex. 40 (Cox 01010233-234). Jacobson failed to consider that Powell controlled access and could readily prevent the visitation supervisor from entering – which ultimately led to the boys' murder. She recognized Powell's ability to flee and the "just in case" possibility, yet took no precaution. *Id.*, Ex. 29. Even though the guardian *ad litem* informed Jacobson the house appeared "staged," she never visited the home unannounced to verify that Josh Powell actually lived there. *Id.*, Ex. 36 (Cox 01010142-43); Ex. 59 (83:12-84:22). In fact, Jacobson warned Powell to stage his home prior to her and Dr. Manley's only visit at the residence, telling him "I need you to have your house prepared for me on Thursday to observe what I would have observed Friday. House set up and you living in it with the boys' belongings in their rooms", *Id.*, Ex. 41. Manley's evaluation included a parenting component – which was skewed by Jacobsen's intervention.

Not only did defendants fail to address safety issues associated with the residence, they also failed to inform law enforcement about the move. Pierce County Sheriff's Detective Gary Sanders, liaison with WVCPD regarding Susan Powell's disappearance, observed threatening behavior by Powell on numerous occasions and worried Powell would harm his children. He testified "[w]e described the house of horrors [Steven Powell's home] that we had observed and discussed our concerns about possible sexual abuse from the evidence found in the house and physical abuse if the boys spoke about the murder (the boys had experienced significant fear and anxiety related to discussing the murder investigation)." *Id.*, Ex. 9, ¶ 12. His concerns were so great that he attended every dependency hearing, which he never did in any other case. *Id.*, ¶ 21. He related all of this information to defendants. Nonetheless, the defendants did not inform law enforcement of the plan to move visitation to Powell's residence. Sanders testified he would have opposed the move. *Id.*, ¶ 20.

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

Pierce County Sheriff's Detective Teresa Berg expressed similar concerns – yet no one contacted her prior to moving visitation. *Id.*, Ex. 10. Jacobson failed to alert law enforcement despite testifying that she believed Powell was dishonest with Utah and Pierce County law enforcement surrounding his father's child porn investigation and Susan's disappearance. *Id.*, Ex. 31 (78:1-79:21)

Even more alarming, Jacobson never informed the court DSHS was moving visitation to Powell's residence or that it occurred – even to the date of the boys' murder the court remained uninformed. *Id.*, Ex. 35.

### 4. Defendants' ended the CPS investigation, dismissed safety concerns and increased visitation.

By mid-November 2011, defendants Stephenson and Reed-Lyyski made the decision to end the CPS investigation because it did not appear that any additional information was going to come to light.[1] *Id.*, Ex. 42. However, Stephenson never actually conducted an investigation. He never entered Steven Powell's home. He never conducted a DV assessment. He never followed up on information surrounding Susan Powell's disappearance. He never inquired about domestic violence with Utah investigators. He ignored Powell's sister's concerns surrounding Powell's involvement in Susan Powell's disappearance and her concerns he might harm the boys. He took no action despite his acknowledgement that the Powell situation presented "serious risk factors." *Id.* Indeed, during discussions with Pierce County Detectives, he and defendant Reed-Lyyski acknowledged that Powell likely murdered his wife. *Id.*, Ex. 9, ¶ 17.

After ending the CPS investigation and receiving new evidence directly implicating Powell in

---

[1] Defendant Reed-Lyyski acknowledged in her deposition that it was still unknown whether Josh Powell was involved in the imagery found on Steven Powell's computers at the time CPS closed its investigation. Bariault Decl., Ex. 8 (61:3-62:3).

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

child porn possession, on November 30, 2011, Jacobson moved to increase Josh's visit time with the boys. *Id.*, Ex. 43 (Cox 01010295). An email to the guardian *ad litem* revealed Jacobson's knowledge of the risk: "They seem appropriate for additional visitation. My worry is increasing time before the psych evaluation is complete (in light of the new information and LE [law enforcement] still insisting that arrest of Josh is imminent on the Susan disappearance case). Please tell me what your position is for increasing visitation at this point." *Id.* Notwithstanding the pending investigations and evaluation, Jacobson proceeded to expand visitation time. Shockingly, in a November 3, 2011 email to the GAL, Jacobson acknowledged the increased visits were not in the children's best interests. *Id.*, Ex. 45 (Cox 01010223). Further, in a November 21, 2011 case note, Jacobson stated that it was agreed no increased visitation would occur due to new evidence surrounding incestuous images being found on Josh's computer and need for further psychological evaluation. *Id.* (Cox 01010267). Any increase would be "damaging" to the children. *Id.*

Knowing the visits were not in the best interests of the children and without waiting for the psychological evaluation to be completed, Jacobson increased the visits. Inexplicably, the additional visitation was supervised by Tim Atkins, the pastor at Powell's church – suggested by Powell – notwithstanding concerns expressed by the boys' counselor directly to Jacobson, about anyone other than a DSHS representative supervising visitation. *Id.*, Ex. 44; Ex. 45 (Cox 01010147). Atkins was not a DSHS representative and had no experience as a visitation supervisor. *Id.*, Ex. 31 (120:6-14); Ex. 45, pp. 263-64 (Cox 01010300-301). Just as Jacobson did not inform the court of the visitation move, she also did not inform the court that a non-DSHS representative was supervising visits. Tellingly, Atkins later asked to be removed as a supervisor when he learned more about Susan's disappearance and Josh's involvement. *Id.*, Ex. 46.

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

### 5. Powell's psychological evaluation showed he was evasive, defensive, suffering from mental disorders and harmful to the boys.

Dr. Manley completed his initial evaluation of Powell on December 9, 2011, without viewing the pornographic images provided by police. *Bariault Dec*., Ex. 39. His report described Josh as defensive and evasive. *Id*. (p. 10 of 22). He noted safety concerns arising from Josh's "foolhardy" decision to take his preschool-aged sons on a camping trip on December 6, 2009 (the night of Susan Powell's disappearance), leaving at midnight on a cold, windy night, to camp less than 40 miles from their home, without telling anyone of the wilderness excursion. *Id*. (p. 18 of 22).

Dr. Manley indicated that results of the Child Abuse Potential Inventory and the Parenting Stress Inventory tests were of questionable validity because Josh was deceptive and defensive. *Id*. (p. 13 of 22). He diagnosed Josh with Adjustment Disorder with Anxiety and Narcissistic Personality Disorder. *Id*. *The Diagnostic and Statistical Manual of Mental Disorders* (5th ed.; DSM-5; American Psychiatric Association, 2013)2 notes that diagnostic features of Narcissistic Personality Disorder include a lack of empathy and failure to recognize other's well-being while only being concerned with their own. Further, the *DSM-5* states that individuals with Narcissistic Personality Disorder are very sensitive to defeat and may react with disdain, rage or defiant counterattack. *Id*. Although Manley concluded that Josh had the intellect and skill to safely parent his sons, he recommended continued supervision of visits based on Josh's inability to "rein in his opinions and commentary for the sake of his children's mental health." *Id*., Ex. 39. Jacobsen had already approved visits at Powell's residence prior to the completion of the evaluation.

Notwithstanding the knowledge of Powell's history, Jacobson informed the court that DSHS

---

2 pp. 669-72.

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

was "not overly concerned about" the psychological test results because "this case is not related to any allegations of actual physical abuse of" the boys. *Id.,* Ex. 47. Yet, defendants conducted no DV assessment and dismissed its possibility although Powell exhibited numerous factors associated with domestic violence; most namely that he may have murdered his wife in the presence of his children.

On January 31, 2012, Dr. Manley completed an addendum to his evaluation report after viewing the computer images released by the Utah court in the child porn investigation, expressing "great concern" that Powell was sexually stimulated by incest. *Id.,* Ex. 48. The addendum said Powell "may not presently be a stable and appropriate resource for his children," adding, "Until he can overcome his defensiveness and openly discuss himself in all areas of his life including sexuality, family, and healthy boundaries, any additional or change of visit structure is not recommended." *Id. (p. 3 of 4).* Jacobson disregarded his warning and did not alter the ISSP; she also did not inform the court that Powell had not been in compliance with court orders, although she admits he was not compliant. *Id.,* Ex: 31 (180:6-12); Ex. 35.

**6. The risk of violence escalated shortly before the children's deaths.**

As of On January 4, 2012, Jacobson had no idea whether the boys would return to live with Powell – indeed, DSHS and Jacobsen had proposed otherwise. *Bariault Decl.,* Ex. 50, ¶ 7. Jacobson, however, emailed Powell on that date asking him about medical coverage for when the boys returned to his home. *Id.,* Ex. 49. On February 1, 2012, the Pierce County Superior Court denied Powell's request to remove the children from the Cox home. *Id.,* Ex. 51. Instead, the court ordered Powell to complete a psychosexual evaluation and a polygraph in response to concerns about the child porn images on his computer. *Id.*

Jane Ramon, a former DSHS supervisor, testified that DSHS should have recognized an

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

increased risk of violence arising on February 1, 2012, when Josh Powell lost his battle with the Coxes and was backed into a corner. *Bariault Decl.*, Ex. 52, ¶ 44. She notes that the department and the defendants should have increased precautions, ensured that visitations occurred in a safe, public location and ensuring that the visitation supervisor was properly trained and equipped to protect the boys. *Id*. DSHS knew or should have known that the father posed a grave threat to the boys, especially after he lost his motion to remove them from their grandparents' home, and failed to assign a supervisor with the skills and experience necessary to protect the boys." *Id*. ¶ 46. Not only did Jacobsen and DSHS lack any basis to assume Powell was not a risk – contrary to their own assertions – they also failed to assess or analyze Manley's evaluation of Powell and realign their supervision and his visitations to address the troubling conclusions expressed in the evaluation. *Id*., Ex. 31 (156:17-158:8). As Jane Ramon noted, "If the standard of care had been met, DSHS would have completed an appropriate investigation, risk assessment, and safety plan, and protected [C.J.P. and B.T.P.] from a foreseeable risk of violence." *Id*., Ex. 52, ¶ 46.

**7. Josh Powell brutally murdered his children during a DSHS supervised visitation at his residence.**

On February 5, 2012, Griffin-Hall drove the boys from their grandparents' home to Powell's house. *Bariault Decl.*, Ex. 53. The boys entered the house ahead of her. *Id*. Powell locked Griffin-Hall out, struck the boys with a hatchet, poured gasoline over their bodies while they were still alive and set them and his house on fire. All three died. *Id*., Ex. 54.

Upon being locked out, Griffin-Hall "knocked and rang the bell repeatedly" before seeking help. *Id*., Ex. 53. After she heard B.T.P. cry, she first moved her car out of the driveway, and then

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

called her supervisor, who told her to call 911.[3]  *Id*.  She had to go to her car to make the calls; she did not even have a cell phone readily available for an emergency.  *Id*.; Ex. 55.  Defendants had no safety plan in place despite warnings from multiple sources, including Dr. Manley just five days earlier.

### III. STATEMENT OF ISSUES

1.  Whether the Court should strike defendants' affirmative defenses nos. 1, 2, 3, 4, 10, 11 and 12?

### III.    AUTHORITY

#### A.    Plaintiffs' Motion to Strike.

A party may move the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f).  A motion to strike pursuant to Rule 12(f) is committed to the discretion of the court.  *Federal Sav. & Loan Ins. Corp. v. Gemini Management*, 921 F.2d 241, 244 (9th Cir. 1990).  While "[t]he presence of a substantial or seriously disputed question of law will preclude a district court from granting a motion to strike," *Mohegan Tribe v. Connecticut*, 528 F. Supp. 1359, 1362 (D. Conn. 1982), such motions are "appropriately granted where the defense is clearly legally insufficient, as, for example, when there is clearly no bona fide issue of fact or law." *United States v. 729.773 Acres of Land*, 531 F. Supp. 967, 971 (D. Haw. 1982) (citations omitted).

#### B.    Affirmative Defense Nos. 3 and 12 (Failure to State a Claim).

Defendants assert that plaintiffs have failed to state a constitutional claim.  Under Rule 12(b)(6), dismissal is only appropriate where plaintiff can prove no set of facts in support of his

---

3 A transcribed version of the 911 call is attached to the *Bariault Declaration* as Exhibit 56.

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

claim which would entitle him to relief. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 338 (9th Cir. 1996). The Court must accept all allegations and all reasonable inferences of the complaint as true. *Cahill*, 80 F.3d at 338. Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added).

The facts present a colorable argument that defendants were deliberately indifferent to plaintiffs' safety, personal security and bodily integrity. The facts support plaintiffs' civil rights claims against each individual defendant. To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Ketchum v. Alameda Cnty.*, 811 F.2d 1243, 1245 (9th Cir. 1987). Plaintiffs raise constitutional claims against four defendants in their individual capacities and there should be no question that each was acting under color of state law at all relevant times.

The Due Process clause of the Constitution protects a citizen's liberty interest in his own bodily security. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006); *Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir. 1989). It is further established that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

corresponding duty to assume some responsibility for his safety and general wellbeing." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 199-200 (1989). When the State asserts this type of custody over a person "and at the same time fails to provide for his basic human needs – e.g., food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by … the Due Process clause." *Id.* at 200. This circuit has acknowledged the rights of children in state custody:

> The Fourteenth Amendment substantive due process clause protects a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent. Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care . . ."
> …
> Understandably, the law does not impose the duty of guarding their own safety on wards of the state. Rather, that duty is the quintessential responsibility of the social workers assigned to safeguard the well-being of this helpless and vulnerable population.

*Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842-43 (9th Cir. 2010) (internal quotations and citations omitted).

To prevail on their claims, the plaintiffs must show that defendants "knew of, and nevertheless disregarded, an excessive risk to plaintiffs' health and safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Taylor v. Ledbetter*, 818 F.2d 791, 797 (11th Cir. 1987) (defendants held liable under § 1983 if they exhibited deliberate indifference to a known injury, known risk, or a specific duty and their failure to perform the duty or act to ameliorate the risk of injury was a proximate cause of plaintiff's deprivation of rights under the Constitution). "'[D]eliberate indifference entails something more than mere negligence…[b]ut is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005) (quoting *Farmer*, 511 U.S. at 835).

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

The facts present a colorable claim that defendants showed deliberate indifference to the rights of C.J.P. and B.T.P.

**C.** **Affirmative Defenses Nos. 1, 2, 4, 10 and 11 (Reasonable Judgment/Good Faith/Privilege/Immunity).**

The defendants' reasonable judgment, good faith and privilege defenses are interchangeable with their immunity defenses. To establish qualified immunity, defendants must prove that their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1987). Qualified immunity is an arduous standard to meet as government officials are charged with knowledge of constitutional and statutory developments, including all decision law. *Kennedy*, 439 F.3d at 1066.

A child's right to reasonably safe conditions, personal security and bodily integrity while in state custody has long been established. *See Deshaney*, 489 U.S. at 199-200. (discussing case law and summarizing the state of the law). It was clearly established at the time of this event that the boys had a right to be free from the harm inflicted by their father through adequate supervision and safety measures that ensured their well-being, required by DSHS's own policy. It was further established that they had a right to be free from harm at the hands of an individual that defendants reasonably believed killed their mother.

Defendants' potential argument that C.J.P. and B.T.P. were murdered by their father as a result of his criminal conduct does not shield them from liability. A government official is individually liable for acts or omissions that set "in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Gini v. Las Vegas Metro. Police Dep't.*, 40 F.3d 1041, 1044 (9th Cir. 1994). "'Anyone who 'causes' any citizen

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

to be subjected to a constitutional deprivation is also liable….[The] requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

## IV.     CONCLUSION

Plaintiffs respectfully request the Court strike defendants' affirmative defenses. Plaintiffs have stated and established claims for negligence and constitutional violations. Defendants failed to adequately investigate obvious signs of domestic violence and moved visitation to an unsecure location that gave Powell the means to kill his children. There is ample evidence that defendants' acts and omissions set in motion a series of events which led to the deprivation of the boys' civil rights. Defendants are not entitled to immunity because their responsibility under the law was clear; they disregarded that responsibility, and set in motion a series of acts that ultimately led to the boys' deaths. Each defendant reasonably should have known that Powell was a significant risk to his children in light of the facts surrounding his wife's disappearance, his aberrant behavior in visitation and given the boys statements related to their mother. Nonetheless, each ignored these obvious warning signs and intentionally acted in a fashion that provided Powell the means to kill.

DATED this 7th day of July, 2015.

FREY BUCK, P.S.

/s/ Evan Bariault
 Anne Bremner, WSBA #13269
 Evan Bariault, WSBA #42867
Attorneys for Plaintiffs

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

LAW OFFICES OF JAMES S. ROGERS

/s/ Cheryl Snow
    James S. Rogers, WSBA #5335
    Cheryl L. Snow, WSBA #26757
    Elizabeth J. Donaldson, WSBA #45291
Attorneys for Plaintiff

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

## Certificate of Service

I certify that on the date noted below I electronically filed this document entitled with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following persons:

Joseph M. Diaz, WSBA #16170
josephd@atg.wa.gov
Peter Helmberger, WSBA #23041
peterh@atg.wa.gov
Jodie@atg.wa.gov
Jennym@atg.wa.gov
TORTacEF@atg.wa.gov
Office of the Attorney General
1250 Pacific Street, Suite 105
Post Office Box 2317
Tacoma, WA 98401
(253) 593-5243
*Attorneys for Defendant*

James S. Rogers, WSBA #5335
jsr@jsrogerslaw.com
Cheryl L. Snow, WSBA #26757
csnow@jsrogerslaw.com
Elizabeth J. Donaldson, WSBA #45291
liz@jsrogerslaw.com
Dawn@jsrogerslaw.com
Law Offices of James S. Rogers
1500 Fourth Avenue, Suite 500
Seattle, WA 98101
(206) 621-8525
FAX: (206) 223-8224
*Attorneys for Plaintiffs*

DATED this 7th day of July, 2015, at Seattle, Washington.

_____ /s/ Evan Bariault _____

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - 26
{00146778;1}

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660