1

HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

UNITED STATES DISTRICT COURT

7

WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

| JUDITH COX and CHARLES COX individually and as Personal Representatives of the Estates of C.J.P. and B.T.P., | CASE NO. 14-05923RBL |
|---|---|
| | ORDER |
| | [Dkt. #s 19 & 24] |
| Plaintiffs, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, FOREST JACOBSON, ROCKY STEPHENSON, JANE WILSON, and BILLIE REED-LYYSKI | |
| Defendants. | |

9

10

11

12

13

14

15

16

17

18    THIS MATTER comes before the Court on the parties' cross-motions for summary

19  judgment [Dkt. #19; Dkt. #24]. This case involves the infamous disappearance of Susan Cox

20  Powell. Her husband, Joshua, is suspected of murdering her. Two years after Susan's

21  disappearance, Joshua murdered their two young sons (ages 7 and 5 years) and took his own life.

22  He killed the boys during court-ordered visitation facilitated by Department of Social and Health

23

24

Services (DSHS) social workers.[1] Susan's father, Charles Cox,[2] has sued DSHS and the social workers assigned to the boys' care. He alleges that the social workers violated his grandsons' Fourteenth Amendment rights by failing to ensure their safety and that DSHS acted negligently in failing to keep the juvenile court abreast of material facts surrounding the boys' dependency.

Susan disappeared from her home in Utah in December 2009. Within weeks of the report that she was missing, Joshua relocated with their sons to Washington. He and the children moved in with his father, Steven. In September 2011, police arrested Steven for possession of child pornography and voyeurism. The Pierce County Sheriff's Department (PCSD) removed the children from Steven's home and placed them with DSHS. Pierce County Superior Court Judge Kathryn Nelson affirmed their placement and subsequent transfer to their maternal grandparents, temporarily stripping Joshua of custody. Once Joshua had a rental home separate from his father's, she also made the informed decision—relying on psychological, investigatory, and testimonial evidence—to allow his children to visit him there. During one such supervised visit, Joshua bludgeoned his sons and set his house on fire, killing his children and himself.

This Court cannot undo the merciless murder of the Powell children or the devastating effect their loss had on their extended family. The Court knows that a very troubled father killed his two sons before taking his own life, the reasons for which belie compassion and

---

[1] The individual defendants are: Forest Jacobson (DSHS social worker), Rocky Stephenson (DSHS Child Protective Services investigator), Jane Wilson (DSHS supervisor), and Billie Reed-Lyyski (DSHS CPS supervisor). Unless context requires otherwise, they are referenced collectively as the "social workers."

[2] For ease and with respect, this Order will refer to Plaintiffs Charles and Judith Cox together as "Cox," and will use masculine pronouns.

understanding. The Court also knows that family members worried about this horrific

potentiality; the fact that it was realized compounding the sadness and outrage felt by all.

But the Court cannot exercise the luxury of hindsight when judging those who attempted

to keep the children safe for failing to do so at the hands of a murderer. DSHS and the social

workers were tasked, as they often are, with walking a razor's edge between helping Joshua to

develop the techniques to better parent his children and protecting the best interests of his

children under the confines of a judicial order.

To ensure the judiciary and those who further its efforts can engage in the pursuit of

justice without fear of vexatious retribution, federal law provides them absolute immunity. The

social workers are not liable to Cox for their recommendations to the court or their facilitation of

the Powell family's court-ordered visitation.

DSHS did reasonably update Judge Nelson about the state of the dependency, so its

decisions were not a proximate cause of the children's deaths. Instead, her informed order

permitting visitation was a superseding cause that severed DSHS's liability as a matter of law.

## I.        BACKGROUND

### A.       Factual History.

The facts are undeniably tragic and largely undisputed. During the Utah investigation into

Susan's disappearance, Joshua moved to Washington with his two sons and lived with his father,

Steven. Two of Joshua's adult siblings, Alina and John, also lived in the home. John often ran

throughout the house naked and in a diaper. He had a hangman's noose, gallows, and an image

of a woman with a sword in her vagina displayed in his room. Approximately eighteen months

after their move Utah police searched Steven's house in connection with Susan's disappearance

1   and removed fifteen computers. These computers contained child and incestuous pornography,

2   as well as evidence of Steven's obsession with his daughter-in-law, Susan.

3       On September 22, 2011, the PCSD arrested Steven for possession of child pornography

4   and voyeurism. Because they were unable to rule out Joshua as a suspect associated with his

5   father's arrest, and because they believed that the Utah police would imminently arrest him for

6   Susan's murder, the PCSD also removed the children from Steven's home. The PCSD placed

7   them into protective custody and transferred custody to DSHS.

8       Joshua did not want his in-laws to obtain custody of the boys, so he entered into agreed

9   dependency. On September 28, 2011, Judge Nelson, who had concurrent jurisdiction over Cox's

10   nonparental child custody action, affirmatively ordered the children into DSHS's temporary

11   custody and supervision. DSHS elected to place the children with Cox. She also ordered DSHS

12   to facilitate supervised visits between Joshua and his sons every Sunday for three hours while

13   Cox attended church. Judge Nelson permitted Joshua, DSHS, and the boys' guardian ad litem,

14   Julio Serrano, to consider expanded visitation.

15       DSHS developed its initial visitation plan with a goal of reunification. The plan allowed

16   for one three hour supervised visit between Joshua and his children each week at the Division of

17   Child and Family Services (DCFS) offices or other DCFS-pre-approved locations, including the

18   Foster Care Resources Network (FCRN) building.

19       On October 26, 2011, Judge Nelson held an initial dependency review. She again

20   concluded that the children should remain in the custody, control, and care of DSHS, and not

21   Joshua. She ordered a minimum of three hours per week for visitation and again permitted

22   expanded visitation. She also ordered Joshua not to disparage his in-laws in front of his children

23   and to undergo a series of psychological examinations.

24

Accordingly, Dr. James Manley began evaluating Joshua at the end of October and continued to do so through January 2012. During this time, Joshua rented a home. He, Serrano, and the social workers agreed to increase the amount of supervised visitation at the house. Dr. Manley observed Joshua interacting with his sons in this setting. Dr. Manley also communicated with Forest Jacobson, one of the social workers responsible for the boys' care; questioned Joshua about his familial and sexual history; and tested Joshua's personality, parental stress levels, and potential for child abuse. In a report to the court, Dr. Manley referred Joshua to a psychologist familiar with personality disorders and forensics. He also noted that Joshua had the skill, intellect, and ability to safely and adequately parent his children during visitation. Dr. Manley recommended that Joshua have ongoing and regular supervised visits with the boys two to three times per week, "predicated on the children's wishes to see their father, the concurrence of their therapist, and [Joshua's] ability to keep his focus on his children."

Dr. Manley reviewed many of the pornographic images seized from Steven's home. In a second report to the court, he referred Joshua for further psychosexual evaluation and a polygraph, because Dr. Manley had concerns that the incestuous pornography found by the police might be Joshua's and not Steven's. Dr. Manley recommended that Joshua not have custody of his children until more was known about Joshua's sexuality, parenting history, attitudes, and ability to maintain healthy boundaries.

On February 1, 2012, Judge Nelson held a second dependency review. She examined Dr. Manley's reports and a report by Serrano. She questioned Serrano and the parties' attorneys. Joshua's attorney informed Judge Nelson that Elizabeth Griffin-Hall—the assigned FCRN visitation supervisor—and Jacobson were in the courtroom, should Judge Nelson have any lingering questions. A PCSD detective was also available in the courtroom. Judge Nelson

1   affirmed Dr. Manley's recommendations. She also emphasized the permanent plan of

2   reunification of Joshua and his sons and ordered visitation to continue as the parties had

3   established: twice a week for a minimum of three hours at Joshua's rental home. At that time,

4   Joshua had not been arrested for association with Steven's illegal activities or for Susan's

5   disappearance.

6         On February 5, 2012, Griffin-Hall and the boys arrived at Joshua's rental home for a

7   regularly scheduled visit. The boys eagerly ran ahead of Griffin-Hall. Joshua locked them in and

8   her out of the house. Joshua bludgeoned his children and set the house on fire, killing his sons

9   and himself.

10         **B.**     **Procedural History.**

11         Cox, individually and on behalf of his deceased grandchildren, sued DSHS in Pierce

12   County Superior Court for negligent investigation and for breach of their duty to protect the boys

13   from harm. DSHS moved for summary judgment on these negligence claims, which the state

14   court denied. Cox amended his complaint to add constitutional claims against the social workers,

15   and the defendants removed the case to this Court.

16         The parties bring cross-motions for summary judgment. Cox argues that the social

17   workers violated the boys' constitutional rights to reasonable safety and adequate care by failing

18   to inform Judge Nelson of Joshua's disparaging remarks about his in-laws and by moving

19   visitation from FCRN to Joshua's rental home. The social workers argue that they are entitled to

20   absolute, or at least qualified, immunity from these §1983 claims. Cox also argues that DSHS

21   was negligent in its care for his grandchildren. He argues that DSHS negligently investigated

22   Joshua's behavior before moving visitation to his house and that DSHS breached a duty to keep

23   the boys safe. DSHS claims state law immunity. It also argues that it did not owe a duty to the

24

1    boys. But if it did, it did not breach that duty and was not the proximate cause of the boys'

2    murder.

3         The Court considers whether the social workers violated the boys' constitutional rights by

4    failing to protect them from Joshua during court-ordered visitation. The Court also considers

5    whether DSHS reasonably provided Judge Nelson with material information and reasonably

6    executed her February order continuing visitation.

7                    **II.**     **DISCUSSION**

8        **A.**    **Standard of Review.**

9         Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

10   file, and any affidavits show that there is no genuine issue as to any material fact and that the

11   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether

12   an issue of fact exists, the Court must view all evidence in the light most favorable to the

13   nonmoving party and draw all reasonable inferences in that party's favor. *See Anderson v.*

14   *Liberty Lobby, Inc*., 477 U.S. 242, 248-50, 106 S. Ct. 2505 (1986); *see also Bagdadi v. Nazar*, 84

15   F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient

16   evidence for a reasonable factfinder to find for the nonmoving party. *See Anderson*, 477 U.S. at

17   248. The inquiry is "whether the evidence presents a sufficient disagreement to require

18   submission to a jury[,] or whether it is so one-sided that one party must prevail as a matter of

19   law." *Id*. at 251-52. The moving party bears the initial burden of showing no evidence exists that

20   supports an element essential to the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S.

21   317, 322, 106 S. Ct. 2548 (1986). Once the movant has met this burden, the nonmoving party

22   then must show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 250. If the

23

24

1  nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving

2  party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

3        **B.**      **§1983 Claims Against the Social Workers.**

4        Cox argues that the social workers violated the boys' Fourteenth Amendment substantive

5  due process rights to reasonable safety and minimally adequate care by moving visitation from

6  FCRN to Joshua's rental home and by allegedly failing to relay to the court that Joshua had

7  disparaged his in-laws in front of his children and that family members and law enforcement had

8  concerns about the children's wellbeing. Defendants counter that the social workers are

9  absolutely immune for executing a court order, or they are qualifiedly immune because they did

10  not violate the boys' clearly established rights.

11           **1.**      **The Social Workers Have Absolute Immunity.**

12        The social workers argue that they are absolutely immune because they facilitated the

13  Powell family's visitation in accordance with their statutorily prescribed duties and a court order.

14  Cox argues that absolute immunity cannot apply to the social workers, because Judge Nelson

15  allegedly predicated her decision on the social workers' incomplete conveyance of information

16  and the harm the children encountered stemmed from the social workers' discretionary decision

17  to move visitation from FCRN to Joshua's home.

18        Prosecutors have absolute immunity due to their function in the judicial system. *See*

19  *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). Prosecutorial immunity

20  ensures prosecutors can independently perform their public duties free from the fear that their

21  actions might give rise to civil liability. *See Coverdell v. Dep't of Soc. & Health Servs.*, 834 F.2d

22  758, 762-63 (9th Cir. 1987).

23

24

Those who perform quasi-prosecutorial functions have absolute immunity as well. Persons responsible for bringing suit often must make such decisions with little or incomplete information and under serious time constraints. *See Meyers v. Contra Costa Cnty. Dep't of Soc. Servs.*, 812 F.2d 1154, 1157 (9th Cir.). Forcing those who initiate and pursue proceedings to defend their decisions after the fact would place a unique and intolerable burden upon them. *See id.* (referencing *Imbler v. Pachtman*, 424 U.S. 409, 424-36, 96 S. Ct. 984 (1976)).

Judges too have long enjoyed a sweeping form of absolute immunity. *See Forrester v. White*, 484 U.S. 219, 225, 108 S. Ct. 538 (1988). This immunity from liability for damages is not for a judge's protection or benefit but for the public's. *See Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213 (1967) (internal quotations omitted). It is in the public's interest for judges to have the liberty to exercise their functions with independence and without fear of retribution. *See id.* If judges were personally liable for erroneous decisions, the resulting avalanche of frivolous and vexatious suits would entice them to avoid rendering decisions likely to provoke disappointment. *See id.* at 226-27. This judicial timidity would manifestly detract from society's exploration of justice. Judges, like prosecutors, enjoy absolute immunity not as a result of who they are but rather as a consequence of the processes and services they render. *See id.* at 227.

Persons who execute court orders similarly have absolute quasi-judicial immunity. *See Briscoe v. LaHue*, 460 U.S. 325, 335, 103 S. Ct. 1108 (1983). Without the fearless and unhesitating execution of court orders by those who receive them, the court's authority and ability to engage in the adjudication of justice would suffer. *See Coverdell*, 834 F.2d at 765. A denial of absolute immunity to those who further the court's function would unfairly spare the judge who gives an order while punishing the receiver who obeys it. *See id.* (citing *Kermit Constr. Corp. v. Banco Credito y Ahorro Ponceno*, 547 F.2d 1, 3, 44 A.L.R. Fed. 542 (1st Cir.

1  1976)). Such a denial could also color a judge's decision-making, causing the court to avoid

2  rendering decisions that would likely bring suit upon its receivers. *See id*.

3      As an integral component of the judicial process, social workers have absolute immunity

4  when performing quasi-prosecutorial and quasi-judicial functions. *See Meyers*, 812 F.2d at 1157;

5  *see also Coverdell*, 834 F.2d at 764-65. "Quasi-prosecutorial" functions in this respect include

6  those instances where a social worker initiates a dependency proceeding or contributes as an

7  advocate to an informed judgment by an impartial decisionmaker. *See Meyers*, 812 F.2d at 1157.

8  "Quasi-judicial" actions include the execution of a court order. *See Coverdell*, 834 F.2d at 764-

9  65. Absolute immunity does not apply, however, to social workers' investigatory conduct,

10  discretionary decisions, or recommendations. *See Beltran v. Santa Clara Cnty.*, 514 F.3d 906,

11  908-09 (9th Cir. 2008).

12      The social workers contributed as advocates to the court during the dependency

13  proceedings. They fought against Joshua having custody of his children. Through their

14  communications with Joshua's attorney and Dr. Manley, they also made Joshua's noncompliant

15  behavior and the status of visitations known to Judge Nelson. Jacobson also attended court,

16  prepared to answer any additional questions about the dependency that Judge Nelson might

17  have.[3] Therefore, the social workers enjoy absolute quasi-prosecutorial immunity for their

18  advocacy to the court, even if hindsight shows Joshua took advantage of their recommendations.

19      Also, through her February order continuing visitation, Judge Nelson ratified Serrano,

20  Jacobson, and supervisor Jane Wilson's discretionary decision to increase the hours of visitation

21  and to hold it at Joshua's rental home. By ordering visitation to continue as it had been, Judge

22  _____

23  [3]    Judge Nelson already knew details about the active investigations regarding Susan's disappearance and Steven's crimes through the dependency information before her and her

24  concurrent jurisdiction over Cox's nonparental custody action.

1  Nelson tasked the social workers with continuing to facilitate visitation at Joshua's home. They

2  had to comply with this directive. Accordingly, the social workers enjoy absolute quasi-judicial

3  immunity for executing her order by facilitating the Powell family's February 5, 2012 visitation.

4  *See Coverdell*, 834 F.2d at 765.

5          **2.**        **The Social Workers are Entitled to Qualified Immunity.**

6          The social workers argue that even if Judge Nelson's February 1, 2012 order did not

7  ratify their decision to hold visitation at Joshua's house, they are qualifiedly immune. They assert

8  that the boys have no constitutional rights at issue, and even if the boys did, the social workers

9  did not violate those rights, and/or those rights were not clearly established.

10          Cox argues that his grandchildren have constitutional rights to protection from harm and

11  minimally adequate care, similar to foster children. He asserts that the social workers violated

12  these rights by showing deliberate indifference to the harms facing his grandchildren.

13          The qualified immunity doctrine shields government officials performing discretionary

14  functions "from liability for civil damages insofar as their conduct does not violate clearly

15  established statutory or constitutional rights of which a reasonable person would have known."

16  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). A two-part test resolves claims

17  of qualified immunity by determining whether plaintiffs have alleged facts that "make out a

18  violation of a constitutional right," and if so, whether the "right at issue was 'clearly established'

19  at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.

20  Ct. 808 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 200-01, 121 S. Ct. 2151 (2001)).

21          Qualified immunity protects officials "who act in ways they reasonably believe to be

22  lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting *Anderson v.*

23  *Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034 (1987)). The reasonableness inquiry is objective,

24

evaluating whether an official's actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *See Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865 (1989)). Even if an official's decision is constitutionally deficient, qualified immunity shields her from suit if her misapprehension about the law applicable to the circumstances was reasonable. *See Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596 (2004). As a privilege from suit, not merely from liability, qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534 (1991) (citing *Malley v. Briggs*, 475 U.S. 335, 106 S. Ct. 1092 (1986)).

          **a.**      **The Boys Had a Constitutional Right to Reasonable Safety and Minimally Adequate Care.**

The social workers argue that they had no constitutional obligation to protect the children from Joshua during court-ordered visitation, because the State generally has no duty to protect its citizens against invasion by private actors (for which they cite *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S. Ct. 998 (1989)). Cox argues that two exceptions to this no-duty to protect rule apply, so the social workers had a constitutional obligation to protect the boys. These two exceptions are: (1) the "state-created danger" and (2) the "special relationship" exceptions.

First, under the state-created danger exception, the state's failure to protect an individual from private violence violates the substantive due process guarantee if the state action creates or exposes an individual to a danger that he would not have otherwise faced. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). To assess the reasonableness of the action, courts consider whether the state actor did in fact affirmatively place the victim in danger. In undergoing this examination, courts neither look solely to the agency of the individual nor to

1  what options may or may not have been available to the individual. Instead, they "examine

2  whether the [state actor] left the person in a situation that was more dangerous than the one in

3  which they found him." *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir.

4  2000).

5        Courts have concluded that state child protective agencies expose children in their care to

6  a danger they otherwise would not have faced when the agency makes poor placement decisions.

7  For example, the Ninth Circuit determined that by approving a foster child's adoption, the state

8  "created a danger of molestation that [the child] would not have faced had the state adequately

9  protected her." *Tamas v. Department of Social & Health Services*, 630 F.3d 833, 843-44 (9th Cir.

10  2010). Similarly, the Seventh Circuit held the state liable for placing a child in an abusive foster

11  home after the state agency had removed the child from her parents' custody. *See K.H. ex rel.*

12  *Murphy v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990). Another court found the state-created

13  danger theory applicable to a child protective agency that had returned a child to her father when

14  he subsequently beat her to death, even though the father's custody was established per court

15  order, because the agency's investigation and recommendation predicated the court's decision.

16  *See Ford v. Johnson*, 899 F.Supp. 227, 233 (W.D. Pa. 1995) (denying the state's motion to

17  dismiss to the extent that the Third Circuit would recognize the state-created danger theory as a

18  viable theory of constitutional recovery).

19        Here, the social workers did not create or expose the children to a situation more harmful

20  than where the social workers encountered them—Steven's home—nor did they provide Judge

21  Nelson with false or incomplete information, as in *Ford v. Johnson*. The boys lived with their

22  grandfather, a voyeur and pornography addict, and their father, a narcissist suspected of

23  murdering his wife. With the assistance of the PCSD, the social workers removed the children

24

1   from that environment and commenced dependency proceedings, stripping Joshua of custody.

2   They facilitated visitation safely at FCRN beginning in October 2011 and at Joshua's house as

3   early as November 2011. Taking the boys to court-ordered supervised visitation did not expose

4   them to a danger greater than what they would have faced had the social workers not intervened

5   in the boys' care but had instead left them in Steven's home and Joshua's custody.

6         Unlike in *Ford v. Johnson*, the social workers did not mislead Judge Nelson nor cause the

7   children to be returned to Joshua's custody. Instead, they fought to keep the boys from his

8   custody by sharing their concerns with Dr. Manley and Judge Nelson. Jacobson shared facts

9   about Joshua's rants against his in-laws and the boys' therapist's professional concerns with Dr.

10  Manley. Dr. Manley detailed this information in a report provided to Judge Nelson.[4] For these

11  reasons, the state-created danger exception does not apply to the factual circumstances at hand.

12        Second, under the special relationship exception, the Constitution imposes upon the State

13  a duty to assume some responsibility for the safety and general well-being of a person taken into

14  its custody and held there against his will:

15              [W]hen the State by the affirmative exercise of its power so
                restrains an individual's liberty that it renders him unable to care
16              for himself, and at the same time fails to provide for his basic
                human needs—e.g., food, clothing, shelter, medical care, and
17              reasonable safety—it transgresses the substantive limits on state
                action set by the Eighth Amendment and the Due Process Clause.
18

19  *See DeShaney*, 489 U.S. at 200 (1989) (citing *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S. Ct.

20  285 (1976) and *Youngberg v. Romeo*, 457 U.S. 307, 315-17, 102 S. Ct. 2452 (1982)). This

21  ———————————————————

22  [4]        Moreover, to hold social workers liable for the dangers associated with transitioning
    visitations to a biological parent's home when a permanent plan of reunification exists would
23  instill in them the same timidity judges and prosecutors would feel doing their jobs without the
    benefit of immunity. The onslaught of potential litigation and blame could make social workers
24  reluctant to remove children from unsafe homes or to help parents develop better skills, so as to
    avoid the reunification process and subsequent potential for suit.

affirmative duty to protect arises from the State's restraint of the individual's freedom to act on his own behalf, not from its failure to act to protect his liberty interests against harms inflicted by other means. *See id*. This special relationship terminates when the individual is no longer in the State's custody. *See id.*

In *Deshaney*, social workers who had learned that a hospitalized child might be a victim of physical abuse obtained a court order placing the child in the hospital's custody. *Id*. at 192. After an investigation, a pediatrician, a psychologist, a police detective, the county's lawyer, several social workers, and various hospital staff determined there was insufficient evidence of abuse to retain the child in the custody of the court. *Id*. After the child was returned to his father's custody, the father severely beat his son, rendering him mentally disabled. *Id*. at 193. The Supreme Court held that the special relationship exception did not apply, because the child was no longer in the State's custody. *Id*. at 201 ("[T]he State does not become the permanent guarantor of an individual's safety by having once offered him shelter."). Therefore, the State did not have an obligation to protect the child from his father.

Here, the boys were in the State's custody at the time of their death. After finding them dependent, Judge Nelson ordered them into the custody, control, and care of DSHS. The boys had not yet been returned to Joshua. Therefore, the special relationship exception to the general rule that the State does not have a responsibility to protect the liberty of its citizens against invasion by private actors applies; the social workers owed the boys reasonable safety and minimally adequate care appropriate to their ages and circumstances while the boys were in the State's custody. *See Lipscomb ex rel. DeFehr v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992).

**b.  The Social Workers Did Not Violate the Boys' Constitutional Rights.**

The social workers argue that even if the boys had constitutional rights to protection and care while in the State's custody, the social workers did not violate these rights. Cox argues that they violated the boys' rights by moving visitation without conducting a safety assessment of the house and by not informing the court of family members' and law enforcements' concerns or of Joshua's disparagement of his in-laws.

To violate a due process right, state officials must act with such deliberate indifference that their actions "shock the conscience." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Bryan Cnty. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382 (1997).

When applied to foster children, and for these limited purposes also to dependent children, the deliberate indifference standard requires the following proof:

> [A] showing of an objectively substantial risk of harm and a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that either the official actually drew that inference or that a reasonable official would have been compelled to draw that inference.

*Tamas*, 630 F.3d at 845 (9th Cir. 2010). The subjective component may be inferred if the risk of harm is obvious. *Id.*

Cox has not made both of these showings. Arguably, the social workers *may* have drawn an inference from gut feelings and speculations that a substantial risk of serious harm to the children existed during visitation generally—given the common supposition that Joshua murdered Susan.

1    But, no proof that Powell posed an objectively substantial risk of harm to his sons during

2   supervised visitation, whether at FCRN or his rental home, existed from which the social

3   workers could have drawn these subjective conclusions. PCSD removed the children from

4   Joshua's custody because Steven's home was unsafe and because they believed Joshua's arrest

5   was imminent, not because evidence showed he was a threat to his sons. By the February 2012

6   hearing, Joshua still had not been charged with any crime. Psychological evidence suggested he

7   possessed the intellect, skill, and practice to parent his children safely and adequately during

8   visitation. Indeed, Judge Nelson, relying on the multitudinous information before her,

9   continually authorized visitation.[5] Therefore, the social workers did not disregard facts that

10   Joshua presented a serious harm to his sons; they did not act with deliberate indifference for the

11   boys' liberty interest.

12    **c.   It was Not Clearly Established that DSHS's Conduct was a Violation of the Boys' Constitutional Rights.**

14    Even if the social workers had violated the boys' constitutional rights, the defendants are

15   entitled to qualified immunity unless the right was clearly established. The social workers argue

16   that during the boys' dependency there was no clearly established federal law that could have

17   alerted a social worker to the possibility that coordinating court-ordered visitation with a

---

[5]    Cox argues that had the social workers been more forthright with the court that Joshua was in violation of her order for disparaging his in-laws or that family members and law enforcement had concern for the children, Judge Nelson may not have reached the conclusion she did. Given the weight of the evidence before her—that Joshua likely murdered his wife and may have enjoyed incestuous pornography—and the state of federal law governing the termination of parental rights, it is unreasonable to say a detailed account of his remarks about his in-laws would have prompted her to then conclude he was an objective threat to his children.
Cox also argues that the social workers were deliberately indifferent because they did not conduct a safety assessment of Joshua's rental home. This is incorrect, because Dr. Manley, Serrano, and Jacobson each evaluated Joshua's rental home.

1    biological father could violate a child's rights. Cox argues that it was clearly established that a

2    social worker could be liable for the harm experienced by a child under the social worker's care.

3           Clearly established constitutional rights are those that a reasonable official could compare

4    his actions to and understand whether or not his behavior violates that right:

5                     For a constitutional right to be clearly established, its contours
                      must be sufficiently clear that a reasonable official would
6                     understand that what he is doing violates that right. This is not to
                      say that an official action is protected by qualified immunity unless
7                     the very action in question has previously been held unlawful ...
                      but it is to say that in the light of pre-existing law the unlawfulness
8                     must be apparent.

9    *See Hope v. Pelzer,* 536 U.S. 730, 739, 122 S. Ct. 2508 (2002) (citing *Anderson v. Creighton,*

10   483 U.S. 635, 640, 107 S. Ct. 3034, (1987)) (internal citations omitted). The specific conduct

11   alleged need not have been previously and explicitly deemed unconstitutional, but existing case

12   law must have made it clear that the conduct violated constitutional norms. *See Kennedy v. City*

13   *of Ridgefield*, 439 F.3d 1055, 1065-66 (9th Cir. 2006). The Court's inquiry is "wholly objective

14   and [ ] undertaken in light of the specific factual circumstances of the case." *Brittain*, 451 F.3d at

15   988.

16          While it is clearly established that the rights and safety of a child supersede a parent's

17   right to visitation generally, it was not clearly established at the boys' death that by facilitating

18   court-ordered visitation, the social workers could be violating the boys' constitutional rights.

19   Indeed, such unlawfulness is still not clearly established. Federal and case law do not clearly set

20   forth liberty interests of protection and care for dependent children visiting a biological parent

21   such that a reasonable social worker could anticipate she was violating the law by coordinating

22   court-ordered and supervised visitation. Therefore, even if Judge Nelson's February 1, 2012

23   order did not ratify the social workers' decision to hold visitation at Joshua's house, making

24

1  them absolute immune, they still have qualified immunity because they did not violate the

2  children's clearly established constitutional rights.

3        **C.**      **State Law Negligence Claims Against DSHS.**

4        Cox claims that DSHS was negligent in its handling of his grandchildren's dependency in

5  at least two ways. He argues that DSHS failed to conduct a reasonable investigation of Joshua's

6  abusive behavior and failed to inform Judge Nelson of Joshua's non-compliant behavior that it

7  knew about, leading her to sanction DSHS's harmful visitation placement decision. *See* RCW

8  26.44.050 (establishing the tort of negligent investigation). Cox also argues more generally that

9  DSHS negligently failed to protect the children by placing them in harm's way.[6]

10        Anticipating DSHS to make a public duty doctrine defense to his second claim (common

11  law negligence), Cox argues that DSHS owed the boys protection for two reasons. Cox first

12  argues that the Legislature intended to impose a duty upon DSHS to care for dependent children

13  when crafting RCW chapter 13.34, which requires DSHS to develop and implement policies

14  regarding dependent children's visitation. Cox next argues that because DSHS was entrusted

15  with the boys' care, DSHS and the boys had a special relationship. He asserts that DSHS further

16  established this relationship when it assured Cox and the boys of the boys' safety. Under this

17  special relationship, DSHS allegedly owed the boys a duty to protect them from harm.

18  _____

19  [6]    Cox's negligence claim is based largely on the fact that DSHS allowed—and did not do

20  more to stop the court from allowing—Joshua to see his sons, even though Cox, the police, Judge Nelson, and everyone else believed he killed their mother. But the State is properly reticent to terminate parental rights on the basis of suspicion.

21      Exactly one year after the murders, a Senate Bill bearing the boys' names was introduced.

22  It would have prohibited a parent "under investigation for homicide" from having custody of, or even visitation rights with, his children. Because this is not good public policy generally—even though it certainly would have benefitted the boys, Cox, the social workers, DSHS, and society if

23  it were the law in this case—the Bill did not pass. It is not the law in Washington that a suspected murderer has no visitation rights.

24

1     DSHS makes at least three counter-arguments, none of which include a public duty

2  doctrine defense. First, it asserts statutory immunity from suit under a Washington law enacted in

3  June 2012 that declares DSHS is not liable for acts performed in compliance with court orders or

4  for its advocacy to the court. *See* RCW 4.24.595. Second, DSHS argues that it owes no statutory

5  or common law duty to guarantee the safety of dependent children during visitation. It asserts

6  that the claim of negligent investigation cannot apply because DSHS arranged visitation, not

7  placement of the children in Joshua's custody; the legislature did not intend to create a private

8  right of action against DSHS; and a special relationship did not exist between DSHS and the

9  boys. Third, DSHS argues that if it is not immune and breached a duty it owed to the boys, its

10  actions were not the proximate cause of their death, because Judge Nelson's February 2012 order

11  ratified its decisions and severed its liability.

### 1.    Statutory Immunity from Negligence Claims.

13     DSHS's first line of defense against Cox's negligence claim invokes a Washington

14  statute that was enacted four months after Joshua killed his sons. That statute provides broad

15  immunity for DSHS (and its employees) when the act complained of was done in compliance

16  with a court order:

17         The department of social and health services and its employees
           shall comply with the orders of the court, including shelter care
18         and other dependency orders, and ***are not liable for acts***
           ***performed to comply with such court orders***. In providing reports
19         and recommendations to the court, employees of the department of
           social and health services are entitled to the same witness
20         immunity as would be provided to any other witness.

21  RCW 4.24.595(2) (effective June 7, 2012) (emphasis added). The effect of the court's order on

22  DSHS's potential liability is discussed in more detail below. But DSHS's argument that this

23  statute provides the easy answer to Cox's negligence claim is misguided.

24

1     DSHS argues that despite (1) the well-settled rule that a statute does not have retroactive

2     effect unless the legislature says it does, and (2) the fact that this statute was enacted *after* the

3     events upon which the lawsuit is based, the statute can and should be applied *prospectively* to

4     grant DSHS immunity because Cox filed suit *after* the statute was enacted. It argues that "the

5     triggering event is not the events underlying the case" but instead the "attempt to hold DSHS

6     liable." Indeed, it repeats this argument, *verbatim*, in its Motion and its Reply [Dkt. #24 at 10;

7     Dkt. #29 at 7].

8     This claim is based solely on a Washington Supreme Court case that DSHS describes as

9     "squarely on point": *In Re Haviland*, 177 Wash.2d 68, 301 P.3d 31 (2013). But *Haviland* does

10    not remotely address the immunity statute upon which DSHS's immunity defense is based, and it

11    does not hold that *that* statute's "triggering event" is the lawsuit seeking to hold DSHS liable,

12    rather than the underlying events giving rise to the cause of action. It certainly does not broadly

13    hold (nor could it, without a seismic shift in the law) that *every* statute enacted after the events

14    forming the basis for a lawsuit applies to the case, so long as it was enacted prior to the date the

15    lawsuit was commenced, or even that this is the general rule.

16    *Haviland* involved an entirely different statute in an entirely different context. Haviland,

17    85, suffered from advanced dementia, and his first wife was deceased. His second wife (Mary,

18    35), exercised "undue influence" over him, leading him to change his will to benefit her, rather

19    than his children. After he changed it, and after he died—but before Haviland's estate was

20    settled—Washington's "slayer" statues were amended "to prevent financial abusers of vulnerable

21    adults from acquiring property or any benefit from their victim's estates." *Haviland*, 301 P.2d at

22    33; *see* 2009 amendments to chapter 11.84 RCW.

23

24

1    In probate, Mary sought to enforce the new will, and Haviland's children sought to

2  disinherit her based on the amendments. Mary argued that the new provision did not apply,

3  because she had "vested rights" that could not be terminated retroactively. The children argued,

4  and the Washington Supreme Court held, that the "triggering event" for the amendments'

5  application was their effort to preclude Mary from taking under the tainted will, not the abuse

6  that led Haviland to sign it. It explained that the amendments' purpose is to "regulate the receipt

7  of benefits," *not* the abuser's conduct while the vulnerable adult is alive. The deterrence for

8  financially abusing vulnerable adults "exists elsewhere"—including in the criminal code.

9  *Haviland*, 301 P.2d at 35. The Washington Supreme Court held that the amendments applied

10  prospectively, and their application to Haviland's probate was "triggered" by the children's

11  "filing of the petition to declare Mary an abuser." *Id*. at 38. It also noted that its decision was

12  "limited to the triggering event of *these* statutes." *Id*. at 34, note 2 (emphasis added).

13    *Haviland* is not authority for the proposition that DSHS immunity statute can or should

14  be prospectively applied to immunize DSHS from negligence and consequences that pre-date the

15  statute's effective date. Instead, the immunity statute is far more analogous to the one at issue in

16  *In re Estate of Burns*, 928 P.2d 1094 (1997) (discussed in *Haviland*, 301 P.2d at 35). *Burns*

17  unremarkably held that the precipitating event for application of a new statute expanding the

18  state's ability to recover medical benefits from an estate was the decedent's receipt of those

19  benefits, not the creation of his estate. Thus, the state's effort to apply the statute to "recover

20  earlier benefits" (pre-dating the statute) from a later-created estate was "an improper retroactive

21  application" of the new law. *Id*.

22    DSHS is not immune from Cox's negligence claim under RCW 4.24.595(2).

23

24

## 2. The Scope of DSHS's Duty.

DSHS's second line of defense is its equally bold assertion that Cox's negligence claims fail as a matter of law because it had "no duty" to investigate the circumstances of the boys' dependency, or to inform the court of material information.

It argues that its duty to investigate applies only in the custody or "placement" context, under RCW 26.44.050. That statute imposes on the DSHS a duty to investigate and to avoid harmful placement decisions, such as a child remaining in an abusive home, or wrongly removing a child from a non-abusive home. DSHS argues that the dependency statute at issue in this case (Chapter 13.34) imposes no similar duty.

But the cases upon which DSHS relies do not stand for that proposition. *Aba Sheikh v. Choe*, 156 Wash.2d 441, 128 P.3d 574 (2006), for example, involved a claim by a third party assaulted by a foster child—an entirely inapposite situation. The Washington Supreme Court unsurprisingly held that DSHS was not liable for failing to predict and prevent the assault: "We hold that the State owes no duty to persons harmed by the tortious acts of dependent children." *Id*. at 449. This is a garden variety application of the public duty doctrine. It is not support for the claim that the state owes no duty to investigate the circumstances of a dependency that poses the same risks encountered in the placement context, where it *does* have a duty: failing to remove a child from a known dangerous situation, or wrongfully removing him from a situation that was not dangerous.

DSHS also relies heavily on *M.W. v Department of Social and Health Services*, 149 Wash.2d 589, 70 P.3d 954 (2003). *M.W.* similarly involved "the scope of DSHS's duty while investigating child abuse allegations." *Id*. at 955. But the harm suffered there was not by a third party, and it was not inflicted upon the dependent child by an abusive parent. Instead, DSHS investigators themselves negligently harmed the child while investigating whether she had been

1    abused. The Court again reiterated that the duty to investigate did not reach this conduct; it was

2    and is limited to "harmful placement decisions." *Id*. at 959. It also noted that DSHS *does* have a

3    "common law duty of care" not to harm children, and specifically did not address the

4    applicability of its holding on that potential claim. *Id*. at 959, 960.

5        Finally, DSHS claims that the Washington Supreme Court has "already rejected" the

6    claim that the dependency statutes were intended to create tort liability. *See* Dkt. # 29 at 9;

7    *Braam v. State*, 150 Wn.2d 689, 711-712, 81 P.3d 851 (2003). But *Braam* involved a class action

8    by foster children on a variety of claims. The Supreme Court "rejected" the plaintiffs' statutory

9    claims—under Chapters 74.14A and 74.13 RCW—because those statutes did not "explicitly

10   create a cause of action" and because implying one would be "inconsistent" with DSHS's "broad

11   power" to administer them. *Id*. The court did not address the statute or the claims in this case.

12   Furthermore, it rejected these statutory claims because the plaintiffs had "other remedies,"

13   including the right to seek redress under the statute that *is* at issue here:

14           We note that parties believing themselves aggrieved by DSHS's
             failure to abide by these statutes, including a foster child through

15           an attorney or guardian ad litem, will have an opportunity to raise
             the issue in the context of dependency actions. *See, e.g.,* RCW

16           13.34.120.

17   *Braam*, 150 Wn.2d 689, 711-712.

18       These cases do not hold, or even suggest, that DSHS has "no duty" to the children to

19   investigate a visitation placement in connection with a dependency proceeding under Chapter

20   13.34 RCW. And that claim simply does not make sense. If DSHS's position were accurate, this

21   case would not be about the steps it took, the information it provided, or the fact that a judge

22   reviewed that information and approved the plan it had made based on it. If DSHS flatly had no

23

24

duty, it would not need to even address whether it was immune or otherwise not culpable based on the Judge's orders.

Instead, it seems clear that in the context of "placement decisions," DSHS has some duty to investigate the circumstances of the dependency in order to reasonably ensure that they do not place a child in an abusive situation or wrongly remove him from one that is not. Such a rule is consistent with the cases cited and with the duty to investigate to avoid "bad placements."

DSHS's motion for judgment as a matter of law on the basis that it owed "no duty" is DENIED.

### 3.    DSHS Reasonably Informed Judge Nelson, so DSHS's Ratified Actions are Not the Proximate Cause of the Boys' Deaths.

DSHS argues that even if it owed a duty to the boys, it did not breach that duty. And even if it breached a duty, that negligence did not proximately cause the boys' death because Judge Nelson's February 2012 order was a superseding cause that severed their liability.

Cox argues that DSHS was negligent, and its negligence proximately caused the boys' death. He asserts that DSHS provided Judge Nelson with insufficient information on which to base her decisions and placed his grandchildren in harm's way. He identifies the following as material facts DSHS allegedly failed to share with Judge Nelson: PCSD Detective Gary Sander's, Cox's, Joshua's sister Jennifer Grave's, and the boys' therapist's concerns for the children's safety; Joshua's disparagement of Cox; Joshua's familial and sexual history; and the visitation location change. He argues that because DSHS negligently informed Judge Nelson of the state of the dependency, her decision authorizing visitation to continue at Joshua's house cannot act as a superseding cause.

Proximate cause includes two elements: legal causation and cause in fact. *See Baughn v. Honda Motor Co.*, 107 Wash.2d 127, 142, 727 P.2d 655 (1986). Legal causation involves the

1   question of whether liability should attach as a matter of law. *See Hartley v. WA*, 103 Wash.2d

2   768, 779, 698 P.2d 77 (1985). It is a determination left to the courts. *See Kim v. Budget Rent A*

3   *Car Sys., Inc.*, 143 Wash.2d 190, 204, 15 P.3d 1283 (2001). Cause in fact refers to the "but for"

4   consequences of an act. *See id.* It is usually a question for the jury; however, it may become a

5   question of law for the court "when the facts are undisputed and inferences there from are plain

6   and incapable of reasonable doubt or differences of opinion." *Baughn*, 107 Wash.2d at 142.

7       Judicial action can break the causal connection between an alleged negligent act and

8   subsequent harm. *See Bishop v. Miche*, 137 Wash.2d 518, 532, 973 P.2d 465 (1999) (citing

9   *Schooley v. Pinch's Deli Market, Inc.*, 134 Wash.2d 468, 482, 951 P.2d 749 (1998)). "[W]hether

10   a court action precludes the existence of proximate cause may be decided as a matter of law

11   when the court is aware of all material information and reasonable minds could not differ on the

12   issue." *Petcu v. WA*, 121 Wash.App. 36, 58, 86 P.3d 1234 (2004) (quoting *Tyner v. Dep't of Soc.*

13   *& Health Servs.*, 141 Wash.2d 68, 86, 1 P.3d 1148 (2000)). In order to assess if DSHS's alleged

14   breach of duty was a cause in fact of the boys' deaths, the Court considers the information before

15   Judge Nelson to determine whether, but for DSHS's alleged failure to keep her abreast of the

16   state of the dependency, she would not have ordered visitation continued at Joshua's house.

17       Cox has failed to identify material information not before Judge Nelson. Through

18   Jacobson, DSHS communicated with Dr. Manley, whose reports to the court detailed the boys'

19   therapist's concerns; Joshua's controlling and self-focused behavior; Joshua's rants about Cox

20   and the media; Joshua's familial, psychological, and sexual history; and that the visitation

21   location had moved from FCRN to Joshua's rental home. Judge Nelson understood that

22   Washington and Utah law enforcement suspected Joshua of murdering his wife and that both law

23   enforcement and Dr. Manley thought Joshua might be sexually deviant. Weighing the

24

1    information she had gleaned from Cox's nonparental custody action and the dependency action

2    against the law regarding Joshua's parental rights,[7] Judge Nelson nevertheless authorized the

3    continuance of visitation and ordered Joshua to undergo further psychological testing.

4         The family members' and Detective Sanders' opinions were based on the same factual

5    information as Judge Nelson had. Reasonable minds could not differ as to whether sharing these

6    biased and commonly-held concerns with Judge Nelson would have prompted her to reach a

7    conclusion different than she reached on the weight of objective evidence on February 1, 2012.[8]

8    The social workers thus did not negligently fail to provide Judge Nelson with any material

9    information. Therefore, her order operated as a superseding intervening cause, cutting off

10   DSHS's liability for any preceding negligence as a matter of law. *See Bishop*, 137 Wash.2d at

11   532; *see also Schooley*, 134 Wash.2d at 482; *Tyner*, 141 Wash.2d at 88; *Petcu*, 121 Wash.App. at

12   58.

13        Furthermore, even if Judge Nelson's order ratifying DSHS's decision to move visitation

14   were not a superseding cause severing DSHS's liability for DSHS's subsequent execution of her

15   _____

16   [7]    "The fundamental liberty interest of natural parents in the care, custody, and management
     of their child does not evaporate simply because they have not been model parents or have lost

17   temporary custody of their child to the State. Even when blood relationships are strained, parents
     retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky v.*

18   *Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388 (1982); *see also* RCW 13.34.020 ("The legislature
     declares that the family unit is a fundamental resource of American life which should be

19   nurtured.").

20   [8]    Judge Nelson could not have lawfully stripped Joshua of custody at that hearing. The
     court placed the children in DSHS's custody because Steven's home was an unhealthy

21   environment and law enforcement believed Joshua would be imminently arrested for Susan's
     murder, not because they believed Joshua sexually or physically abused his boys. *See* RCW

22   13.34.180 (addressing the allegations needed to file a petition for termination of a parent child
     relationship).

23        Judge Nelson also could not have taken away Joshua's right to visitation. His
     noncompliance—disparaging Cox—did not adversely affect his children's health, safety, or

24   welfare. *See* RCW 13.34.136(2)(b)(ii).

order, reasonable minds could not conclude that DSHS negligently facilitated the Powell family's February 5, 2011 visitation. DSHS may change a visitation plan in light of "increased or decreased safety concerns, changes in permanency plans, and/or the well-being of the child." Given the relative success of earlier family visits, Dr. Manley's determination that Joshua could safely parent during supervised visitation, Serrano's consensus, Judge Nelson's authorization, Griffin-Hall's supervisory presence, and the continuing goal of reunification, DSHS reasonably increased the duration of visitation and reasonably moved the location to Powell's rental home— DSHS's preferred visitation location.

### III.    CONCLUSION

The Court feels immense sorrow for the Cox family's losses and the heartbreak they have been forced to weather. The Court also feels sorrow for the social workers subjected to Joshua's sickness, yet grateful for their willingness to enter their profession. The Court is equally grateful to Judge Nelson, who considered the evidence before her with sound reasoning and solemnity.

An integral component of the judicial system, social workers require absolute immunity under federal law when performing quasi-prosecutorial and quasi-judicial functions, as occurred here. The social workers are absolutely immune from Cox's § 1983 claims and entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

DSHS did not negligently inform Judge Nelson about the state of the dependency. Therefore, it was not the proximate cause of the children's deaths, because Judge Nelson's February order was a superseding cause that severed DSHS's liability as a matter of law. DSHS is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

>>

>

1    Cox's Partial Motion for Summary Judgment [Dkt. #19] is DENIED, and Defendants'

2    Motion for Summary Judgment and Qualified Immunity [Dkt. #24] is GRANTED. The case is

3    DISMISSED.

4        Dated this 6th day of October, 2015.

5

6    _____

7    Ronald B. Leighton
     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER - 29